J. FITZMAURICE, Appellee, v. MERCHANTS' NATIONAL BANK
et al., Appellants.

GUARANTY: Discharge of Guarantor—Good Faith of Guarantee—
1   Voluntary Loss—Notice. A guarantor is entitled to demand per-
fect good faith from the guarantee, especially when their interests
are identical and when the extent of the liability of the guarantor
depends largely on the good faith of the guarantee. In such case,
the guarantor is entitled to notice of any *proposed* action on the
part of the guarantee at war with such identity of interests. The
guarantee may neither barter away the rights of the guarantor
nor voluntarily suffer a loss and then charge such loss to the
guarantor.

PRINCIPLE APPLIED: Plaintiff sold to defendants his inter-
est in a bank and, to the extent of $1,855, guaranteed defendants
against loss on a judgment of over $5,000, then held by the bank
against the estate of a deceased and his surviving wife. Plaintiff
deposited $1,855 in the defendants' bank to await the outcome of
collections on the judgment, and removed from the state. The
collection of the judgment was solely in the hands of defendants.
The estate of deceased consisted of an incumbered farm, appraised
under administration at $90 an acre, with no buyers. An unin-
cumbered 40 acres was set aside to the widow as her distributive
share. Later, defendants, as officers of the bank, and other cred-
itors of said estate, formed a syndicate to purchase the lands on
their own account and sell at a profit. They first purchased the
widow's share, part of the consideration being *a release of the
widow from all liability on the judgment in question.* Plaintiff
had no notice of the proposed purchase or of the release to the
widow. The syndicate also purchased the remaining 260 acres,
under a new appraisement, at $70 an acre. The administrator was
able therewith to pay 23% on the claims. Defendants notified
plaintiff that the bank would lose over $4,000 on the judgment,
and "that no further recourse could be had against the widow",
and asked him to surrender his deposit of $1,855 in fulfillment of
his guaranty, and plaintiff complied. Within four months of the
purchase, the syndicate sold the land at a profit of $7,500. Plain-
tiff then learned the truth of the transaction. *Held,* (a) that plain-
tiff, the guarantor, was entitled to notice of defendants' purpose
to become purchasers of the estate instead of remaining creditors,
and (b) that, by releasing the widow from liability on the judg-

ment, the defendants converted their claim into real estate, and plaintiff was entitled to have the real estate taken into account in determining the bank's actual loss.

**EXECUTORS AND ADMINISTRATORS: Management of Estate—**
2 **Adverse Attitude of Administrator.** It is manifestly improper for an administrator to enter, directly or indirectly, into an arrangement contemplating the purchase by him of the assets of the estate.

**GUARANTY: Discharge of Guarantor—Guarantee Assuming Antag-**
3 **onistic Attitude—Notice.** When the interests of the guarantor and guarantee are identical, the guarantor has a right to notice of the intention of the guarantee to assume a counter-attitude.

PRINCIPLE APPLIED: See No. 1.

**GUARANTY: Discharge of Guarantor—Guarantee Changing Form of**
4 **Guaranteed Claim—Effect.** When the guarantee sells or trades the guaranteed claim for other property, without the knowledge of the guarantor, the value of such other property will be looked to in determining the final loss to the guarantee.

PRINCIPLE APPLIED: See No. 1.

*Appeal from Wright District Court.*—HON. C. G. LEE, Judge.

WEDNESDAY, NOVEMBER 24, 1915.

ACTION in equity to set aside a certain transaction had between the parties, whereby the plaintiff endorsed and surrendered to the defendants a certain certificate of deposit for $1,855. Plaintiff alleged that he surrendered such certificate to the defendants in reliance upon certain false representations then made to him. Plaintiff prayed for the restoration of the *status quo* under said certificate of deposit and for an accounting by the defendants and for general relief. The defendants answered, denying all alleged fraudulent representations. There was a decree for the plaintiff, awarding him a recovery of $1,465 against all the defendants, other than the defendant bank. Such defendants have appealed.— *Affirmed.*

*Birdsall & Birdsall* and *Eugene Schaffter*, for appellants.

*Healy & Thomas*, for appellee.

EVANS, J.—Prior to August, 1911, the plaintiff was the president of the Merchants' National Bank, defendant herein, and was the owner of a majority of its stock, in that he held 371 shares out of its total of 500 shares, all of a par value of $100. In August, 1911, the defendants, Focht, Fort, Armbruster, Sorenson and Wasem, purchased all of the plaintiff's shares at the agreed price of $125 a share. They thereupon succeeded to the management of the bank, Focht .becoming president and the other defendants becoming managing officers. Among the assets of the bank was one item of doubtful value. It was originally a note for $4,650, signed by one Hadle Thorson and Anna Thorson, his wife. The claim had been reduced to judgment against both makers and amounted, with interest and costs, to a sum considerably in excess of $5,000. In the year 1910, Hadle Thorson died, and his estate was in course of administration at the time of the transaction between these parties. Under the terms of the contract of purchase and sale of the bank stock in question, the plaintiff guaranteed the purchasers against loss by reason of the Thorson item to the extent of $5 a share, or a total of $1,855. Such contract provided as follows:

1. GUARANTY: discharge of guarantor: good faith of guarantee: voluntary loss: notice.

"This agreement further witnesseth that in consideration of the sum of money paid and to be paid to the first party, and the other agreements herein contained, the first party hereby agrees to deposit and to keep on deposit in said Merchants' National Bank of Eagle Grove, Iowa, the sum of eighteen hundred and fifty-five dollars in a certificate of deposit properly endorsed as payable to the order of the second party and to be used only for the purpose of protecting the second party and each of them from any and all loss or damage which they may sustain on account of a certain promissory note of one Hadle Thorson and his wife, Anna Thorson, to the Merchants' National Bank, in the amount of $4,658.00 and interest and costs, said note having been

reduced to judgment, and the said amount of $1,855.00 shall be applied by second party in payment and satisfaction of any and all loss to them on account of said note and judgment, in whole or in part, and said deposit shall be maintained by first party until said note and judgment are fully paid and satisfied, and second party agrees that first party shall have interest at the rate of five per cent. upon said deposit payable annually, and to pay him any overplus that may be left after payment of said note and judgment to said bank.''

After transferring his interest in the bank to these defendants, the plaintiff removed to California in December, 1911. In June, 1912, these defendants reported to the plaintiff by letter that they had received a dividend from the Thorson estate of 23 per cent. and that this exhausted the estate and that the bank would lose upon such item more than $4,000. On this ground, they requested the plaintiff to surrender to them the certificate for $1,855, which evidenced the deposit made by him in pursuance of his contract of limited guaranty. In reliance upon the representations thus made, the plaintiff surrendered the certificate. The grievance of the plaintiff is predicated upon certain acts of these defendants had subsequent to December, 1911, which involved the purchase by them of the property of the Thorson estate, whereby they voluntarily suffered loss as creditors in order to enlarge their profits as purchasers. The loss thus voluntarily sustained, they charged against the plaintiff, to the extent of $1,855. In obtaining the acquiescence of the plaintiff thereto, they withheld from him all knowledge of their changed relation from creditor to purchaser. The Thorson estate consisted in the main of a farm of 304 acres, encumbered by a mortgage of about $10,000. The land had been appraised in 1910 at $90 an acre, but no purchaser had been found therefor. The administrator was C. J. Lund, who was

also a creditor for a small amount. The distributive share of the widow had been set apart, and consisted of an unencumbered 40 acres, including the residence and appurtenant buildings. In March, 1912, these defendants, acting for their bank, entered into a syndicate agreement among themselves and with other creditors of the Thorson estate, representing about $10,000 of claims, whereby they proposed to purchase the Thorson farm and to resell the same at a profit. The interest of each party to this agreement was in proportion to the amount of his claim against the estate. They first obtained an option from Mrs. Thorson for her distributive share, for an agreed consideration. The syndicate agreement included the name of C. J. Lund as one of the parties thereto. Lund, however, did not sign such agreement, but did then and there sell his claim against the Thorson estate to the syndicate for an amount less than its face value. A re-appraisement was had of the 264 acres left after carving out the distributive share of the widow, and the same was re-appraised at $70 an acre and was immediately sold to the syndicate at that price. The distributive share of the widow was also purchased under the option. The consideration therefor was the release of the widow from all liability upon all the claims of the creditors constituting the syndicate, and the payment of the further sum of $6,000. The land thus purchased was resold in a little less than four months at $107.50 an acre, which made a profit to the syndicate of approximately $7,500. It is the contention of the appellee that, inasmuch as the defendants resorted to this method for the confessed purpose of realizing on the Thorson item, the measure of his liability as a limited guarantor against loss was determined by the net outcome of such transaction. If this be not so, then the transaction itself became fraudulent as to him. He contends also that he was entitled to information as to what was done, and that the withholding of the same was a fraudulent concealment, and that the certificate in question was obtained from him by

fraudulent representations.   On the other hand, the appellants contend that the formation of the syndicate was entirely legitimate, and that these parties purchased the land at their own risk and for their own profit, and that they owed to the plaintiff no duty of conduct or information.

There was nothing improper in itself in the formation of the syndicate or in the purpose thereof, unless it be the apparent attempt to include the administrator as a member

of the syndicate, and unless it be also the purchase from the administrator of his claim against the estate.   To include the administrator in the syndicate would be highly improper, and, if the same purpose was attained by the purchase of his claim, it was no less improper. Passing this question, however, the claim of the plaintiff rests upon a broader basis.   The agreement between the parties, whereby the plaintiff became a limited guarantor against loss, and whereby the management and control over such claim was transferred to the defendants, implied reasonable efforts and good faith on their part to save the bank against loss on such claim.   As to such claim, the interests of the contracting parties were identical.   If the claim were lost, not only would the plaintiff lose to the amount of his guarantee, but the bank and the purchasers of the stock must bear the remainder of the loss. · This was the relation of the contracting parties to the Thorson item when the plaintiff left the state and ceased to have management of the claim or knowledge of the transactions in relation thereto.   As long as the interests of these parties were identical in that respect, the plaintiff might well rely upon such efforts as the defendants should put forth in their own interests and might well be willing to accept the result.   But when these defendants became proposed purchasers of all the property of the estate, they reversed their interest therein.   They became thereafter interested in reducing the selling price of such property.   Whatever they might

2. EXECUTORS AND ADMINISTRATORS : management of estate : adverse attitude of administrator.

lose thereby as creditors, they were bound to win as purchas-
ers.    Clearly, the plaintiff was entitled to

**3. GUARANTY:**
**discharge of**
**guarantor:**
**guarantee as-**
**suming antag-**
**onistic atti-**
**tude: notice.**

know such changed relation before he was
called upon to surrender his certificate.    We
think, also, that he was entitled to know it
before the purchase of the property by these
defendants, in order that he might withdraw his reliance
upon the defendants and select his own method of protecting
himself.

We have already said that a part of the consideration
for the purchase of the widow's distributive share was to
release her from all liability on this claim and others.    The
effect of this arrangement was that this very

**4. GUARANTY:**
**discharge of**
**guarantor:**
**guarantee**
**changing form**
**of guaranteed**
**claim: effect.**

claim was used as a part of the consideration
for the purchase of such distributive share.
In so doing, these defendants converted their
claim against Mrs. Thorson into real estate.
But for such act, the plaintiff would have been entitled to
require them to collect the claim from Mrs. Thorson.    Their
release, however, was binding, and no recourse could there-
after be had as against Mrs. Thorson.    Having irrevocably
converted this claim, therefore, into real estate, it is clear
that the plaintiff was entitled to have such real estate taken
into account in determining the measure of the bank's actual
loss and the measure of his liability under his guarantee.
The letter written by the defendants to the plaintiff, inform-
ing him of the loss and requesting the surrender of the cer-
tificate, contains the following:

"Mr. J. W. McGrath informs the bank that there can
be no further recourse on the widow and so this will mean a
loss to the bank and to the committee purchasing your 371
shares greater than the amount of the guarantee money
($1,855.00) on deposit at the present time."

This was written after the actual release of the widow by
the defendants themselves under their contract.    The plain-

tiff was not informed of this fact, but the implication of the letter was that the remedy against the widow had been exhausted. It further appears from the testimony that the price paid for the Thorson land was substantially less than its value at that time. The trial court held that account should be taken of the land transfer in determining the final loss of the bank on the Thorson item. The amount of such net loss to the defendants was charged against the plaintiff, and he was permitted to recover from the defendants the balance of the proceeds of the surrendered certificate. We think the conclusion of the trial court was correct. The amount awarded the plaintiff was $1,465. It is urged by the appellants that this amount was excessive by more than $100, and we are asked to reduce the judgment accordingly. The items in the record involve expenses and compensation for the defendant Focht as trustee, and commissions paid to others, amounting to a total of about $1,500. The record does not disclose to what extent these items may have been scaled by the trial court. The items themselves impress us as very large, and we would not be justified upon this record in reducing the amount of recovery. The decree entered below will be accordingly—*Affirmed.*

DEEMER, C. J., WEAVER and PRESTON, JJ., concur.